UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., and
NICHOLAS AND ELIZABETH VAN ENGEN,

        Plaintiffs,

vs.                                Case No. 2:20-cv-01455

ELECTROLUX HOME PRODUCTS INC.,

        Defendant.

**DEFENDANT, ELECTROLUX HOME PRODUCTS, INC.'S, MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS OF MICHAEL STODDARD**

      Defendant, Electrolux Home Products Inc. (hereafter, "Electrolux"), by its undersigned counsel, submits this memorandum in support of its motion, pursuant to Federal Rule of Evidence 702, seeking an order excluding certain opinions of Michael Stoddard which do not reflect a reliable application of the principles and methods to the facts of the case.

## BACKGROUND

      This case concerns three separate house fires that occurred on November 9, 2017 at the Flones household, February 3, 2018 at the Van Engen household, and March 15, 2018 at the Curtis household (collectively, the "Fires"). Doc. 1, ¶¶ 31, 35, 39. (Compl.). None of the Fires were related in any way, other than Plaintiffs' theories concerning the cause are the same for each of the Fires: the basis for Plaintiffs' products liability claims against Electrolux is that each of these three fires originated in and was caused by the Electrolux-manufactured clothes dryers present in the Curtis, Flones, and Van Engen homes (the "Dryers"). In support of their claims, Plaintiffs offer the opinions of Michael Stoddard, a fire and engineering failure analyst. Exh. A (Stoddard CV). Mr. Stoddard has extensive

1

experience testifying for Plaintiffs' counsel in cases involving fires, particularly against Electrolux, throughout the country. Exh. B, (Stoddard Dep. 53-60).

Mr. Stoddard's report provided in this case is 212 pages, the first 200 of which contain his "general" opinions that he offers in all Electrolux dryer fires cases. Exh. C. In his deposition, Mr. Stoddard explained that "there is only one report," that those first 200 pages contain his "general opinions" which he re-uses by copying and pasting those pages into a new report. Exh. B, (Stoddard Dep. 65:13-14-66:16-23) ("…in terms of the general opinions are things that I re-use and copy and paste from."). The remaining 12 pages are the only pages in his report that reflect his commentary and conclusions specific to this case.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 was recently amended[1] and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if <u>the proponent demonstrates to the court that it is more likely than not that</u>:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the ~~expert has reliably applied~~ <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

FRE 702. The changes to FRE 702 took effect December 1, 2023. Pursuant to Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("Daubert I"); *see also,*

---

[1] The underlined portions reflect language that was added to FRE 702 and the strikeouts reflect language that was deleted from FRE 702.

*Kuhmo Tire Co. v. Carmichael* 526 U.S. 137, 149 (1999) (extending *Daubert* to all expert testimony). "Under *Daubert* and *Kuhmo Tire*, the court must serve as a gatekeeper to ensure that proffered expert testimony meets the requirements of Federal Rule of Evidence 702." *Moore v. Nat'l Presto Indus., Inc.*, 603 F.Supp.3d 676, 680 (W.D. Wis. 2022). Moreover, proponents bear the burden of proving, by a preponderance of the evidence, the admissibility of their experts' testimony. *See Daubert I,* 509 U.S. at 592-93. The testimony of the expert, who must be "qualified as an expert by knowledge, skill, experience, training, or education," is only relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert I*, 509 U.S. at 588.

The amendments to FRE 702 emphasize the court's gatekeeping function. (Report to the Standing Committee on Rules of Practice and Procedure from the Advisory Committee on Evidence Rules, May 15, 2022 p. 872) ("it is the court and not the jury that must decide whether it is more likely than not that the reliability requirements of the rule have been met"). As explained by the Advisory Committee on Evidence Rules:

> The language of the amendment more clearly empowers the court to pass judgment on the conclusion that the expert has drawn from the methodology. Thus the amendment is consistent with *General Electric Co. v. Joiner,* 522 U.S. 136 (1997), in which the Court declared that a trial court must consider not only the expert's methodology but also the expert's conclusion; this is because the methodology must not only be reliable ***it must be reliably applied***.

*Id.* at 871 (emphasis added). The Committee further addressed the fact that many courts have stated that the reliability requirements set forth in FRE 702 (b) and (d) are questions of weight and not admissibility. The Committee explained that "[t]hese statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence." Whether it is more likely than not that an expert witness' testimony is based on sufficient facts or data and the expert's opinions reflect a reliable application of the principles and methods to the facts of the case, are questions of admissibility, <u>not</u> weight.

**ARGUMENT**

Mr. Stoddard's kitchen sink approach—quite literally reusing the same 200 pages of opinions in each Electrolux case in which he's retained—does not comport with FRE 702's requirements and therefore certain opinions proffered by Mr. Stoddard should be excluded. Specifically, Mr. Stoddard offers opinions concerning design defects, manufacturing defects, and the alleged inadequacy of Electrolux's warnings, labels, installation instructions, and owners' manual. Exh. C, (Stoddard Rep., pp. 208, 210). These opinions, discussed further herein, should be excluded as they are not supported by an application of principles and methods to the facts of the case.

Roughly 94% of Mr. Stoddard's report is reused in cases in which he is retained by plaintiffs' attorneys to opine that an Electrolux clothes dryer was the cause of a fire. *See* Exh. B, (Stoddard Dep. 66). In this case, Plaintiffs cannot establish, by a preponderance of the evidence, that Mr. Stoddard's opinions reflect a reliable application of the appropriate principles and methods to the facts of the case as required by FRE 702(d).

Mr. Stoddard did not apply the principles and methods of his profession to the facts of each of the three Fires in this case. Mr. Stoddard has pre-existing opinions that he assumed apply to each of the Fires in this case, with limited to no analysis of the specific facts in this case. In fact, Mr. Stoddard acknowledged in his deposition that he did not review all of the "reliance material" referenced in his report. Exh. B, (Stoddard Dep. 74:16-25 - 75:1-17). Why? Because he formed all his opinions, and already had drafted the bulk of his report, long before the Fires even occurred. Mr. Stoddard testified in his deposition that NFPA 921 is "the guide to fire and explosion investigation," (Exh. B, (Stoddard Dep. 76:18-19)) however, a review of the record makes clear that to render his opinions in this case, Mr. Stoddard did not undertake a meaningful analysis that comports with NFPA 921, and therefore his opinions concerning design defects, manufacturing defects, and safety warnings should be excluded.

## I. MR. STODDARD'S OPINIONS THAT DEFECTS IN THE DESIGN OF THE ELECTROLUX DRYER CAUSED THE FIRES SHOULD BE EXCLUDED.

Mr. Stoddard's opinions concerning design defects allegedly present in the Dryers do not reflect a reliable application of engineering principles and methods to the facts of the case. With regard to each of the Fires, Mr. Stoddard opines that the Electrolux Dryers were designed in a way that allows the accumulation of lint near the heat source and therefore "the fires were caused by the inherent defects in the design of the clothes dryer...." Exh. C, (Stoddard Rep.). In other words, he begins with the conclusion that the design of the subject dryer is inherently defective, and then presumes the dryer must be the cause of the fire. He also generally opines that all the Fires were caused by "…the inability of the dryer to contain the fire as well as the unnecessarily large quantities of plastics that emitted smoke and other byproducts of combustion through the structure." (*Id.* at 208). However, Stoddard did not reliably apply principles and methods to the three, distinct fact sets that comprise this case to arrive at such conclusions.

According to Stoddard, in reaching his conclusions on cause and origin of the Fires he applied NFPA 921 ("the guide to fire and explosion investigation") and the scientific method. Exh. B (Stoddard Dep. 76:3-19). "A growing body of case law shows that courts are generally ruling that NFPA 921 embodies the standards of the field." Daubert admissibility—Scientific foundation of testimony—NFPA 921 as the standard in fire investigation, 5 Mod. Sci. Evidence § 37:9 (2023-2024 Edition). Stoddard did not do any testing on the Dryers and instead relied on Mr. Keefe's (Plaintiffs' other expert) testing of the Dryers.

Moreover, Stoddard would not concede that increased lint accumulation within a dryer presents an increased risk of a fire. Exh. B, (Stoddard Dep. 105, 107). Plaintiffs' other expert, Mr. Keefe, who Stoddard acknowledges is the "primary expert in terms of the causes of the fire" (Stoddard Dep. 88:9), testified at his deposition that (i) cleaning lint from the interior of a dryer will reduce the

likelihood of a fire, (ii) that lint buildup is a common cause of dryer fires, and that (iii) restrictions in airflow increase lint accumulation:

```
                                                              Page 100
 1    Q. Have you ever investigated fires in bulkhead
 2  dryers?
 3    A. Yes.
 4    Q. Do you -- is it your opinion that cleaning
 5  lint from the interior of a dryer will reduce the
 6  likelihood of a fire?
 7        MR. HARMEYER: Object to the form. It's an
 8  incomplete hypothetical.
 9    A. Yeah, I agree that if you clean the entire
10  interior of the dryer and remove lint you're going to
11  reduce the likelihood of a fire.
12    Q. Do you agree that lint buildup is a common
13  cause of dryer fires?
14        MR. HARMEYER: Object to form.
15    A. Yes.
16    Q. Do restrictions in airflow increase lint
17  accumulation?
18    A. Yes.
19    Q. Then is that true of any type of dryer?
20    A. Yes.
```

Exh. D, (Keefe. Dep. 100: 4-20). In stark contrast to Mr. Keefe, Stoddard testified that (i) cleaning out lint will not necessarily decrease the chance of fire; (ii) "never cleaning lint from the dryer lint screen or inside the dryer or the dryer venting should only result in a performance problem"; and (iii) reduction in airflow does not necessarily increase the amount of lint." Exh. B, (Stoddard Dep. 105; 107; 110; 112; 120-121:21-24). *See, e.g.*:

> 24   Q. But all I'm asking you is, is it your opinion
> 25   that there is any -- is there any dryer design or any
>
> Page 121
> 1   dryer model that you are aware of that a user can
> 2   operate safely without ever cleaning out lint from the
> 3   dryer?
> 4         And you used "safely" in your previously
> 5   answer. I don't believe I need to define safely.
> 6         Was it your opinion that there is any dryer
> 7   that a user can define safely without ever cleaning lint
> 8   from the dryer?
> 9   A.   I still do think I need you to define the word
> 10  safely. Like what do you mean? Is there --
> 11  Q.   I mean, you are offering opinions in this case
> 12  on whether the design of these dryers, the warnings, the
> 13  lack of warnings, whether that is safe or unsafe.
> 14        So you have an idea of what the word "safe"
> 15  and "safely" means.
> 16        So I'm asking, is there any dryer that you are
> 17  aware of that a user can operate safely without ever
> 18  cleaning out lint?
> 19  A.   I still don't understand the question in the
> 20  way that you're asking.
> 21        But I can say is that never cleaning lint from
> 22  the dryer lint screen or inside the dryer or the dryer
> 23  venting should only result in a performance problem. It
> 24  should not result in the risk of injury or death.

Mr. Stoddard's deposition testimony is in conflict with Mr. Stoddard's own reliance materials and the opinions proffered by Keefe, "the primary expert on the fires." A jury would not be aided by the presentation of this testimony, it would be further confused. Moreover, Stoddard's fidelity to his pre-existing opinions blinds him from accepting commonsense notions because they might threaten his ultimate conclusions. For example, he refused to acknowledge that excess lint in any of the Dryers or venting could have caused the Fires. Likewise, he refused to consider that the Fires could have resulted from the owners' failures to properly install the Dryers and/or to maintain the Dryers—specifically, cleaning the Dryers as advised in the Electrolux instructions. *See, e.g.,* <u>Exh. B</u>, (Stoddard Dep. 194:20-24) (acknowledging Curtis dryer was not installed fully in compliance with the

installation instructions); (Stoddard Dep. 203:5-12) (acknowledging Flones dryer was not installed fully in compliance with the installation instructions); (Stoddard Dep. 208:14-20) (acknowledging Van Engen dryer was not installed fully in compliance with the installation instructions).

The accumulation of lint inside clothes dryers due to a failure to properly install and maintain is a known cause of home fires and property loss, which Plaintiff, American Family, is well-aware of, and about which it has been warning its insureds for many years – well before the Fires. American Family warns its insureds that "there are many potential causes of house fires" and provides a list of ways to prevent them, including "clear the lint trap of the clothes dryer after every load and keep the outside vent clean." (*5 Tips to Learn How to Prevent House Fires*, Apr. 2, 2020 (https://www.amfam.com/resources/articles/at-home/5-ways-to-prevent-house-fires (last visited 12/20/2023)). American Family also warns its insureds that "one easy way to prevent a call to the fire department" is to "vacuum the back of clothes dryers to eliminate lint build-up, and check that lint screens are not clogged or blocked." (*Rental Property Maintenance*, Oct. 1, 2016 (https://www.amfam.com/resources/articles/your-business/managing-safe-apartment-complexes (last visited 12/20/2023)). Mr. Stoddard himself is aware of the correlation between failure to properly maintain and lint accumulation resulting fire and cites in his reliance materials to almost two dozen letters and reports issued by the Consumer Products Safety Commission pertaining to fires in clothes dryers. (*See* Stoddard Rep., p. 17.) Many of the cited CPSC materials discuss the CPSC's testing of different dryer designs and the effects of lint accumulation and above-normal operating temperatures (due to lint screen or venting blockages), and that such conditions result in lint ignition and/or dryer fires. (*See id.*).

Even though he acknowledges Plaintiffs failed to comply with Electrolux's installation instructions and dryer maintenance procedures, Mr. Stoddard still refuses to consider other potential causes for the Fires, demonstrating a methodology inconsistent with FRE 702 and NFPA 921 and

therefore his opinions on causation should be excluded. *See, Bryte ex rel Bryte v. Am. Household, Inc.,* 429 F.3d 469, 477-78 (4th Cir. 2005) (quoting NFPA 921, district court appropriately excluded opinion that failed to "exclude all other reasonable origins and causes" and thereby "prevent expert speculation"). Mr. Stoddard's opinions do not reflect a reliable application of principles to the facts of the case, and are in conflict with Mr. Stoddard's own cited reliance materials and Mr. Keefe's opinions who Stoddard identifies as the "primary" expert on the Fires. This conflict risks confusing the jury.

Next, Stoddard generally opines that inclusion of certain plastic components in the Dryers resulted in the Dryers' inability to contain the Fires. Stoddard's opinions concerning the incorporation of plastic components in the Dryers do not reflect a reliable application of the principles and methods to the facts of the case as required by FRE 702(d) and will not help the trier of fact understand the evidence or to determine a fact in issue. For example, Mr. Stoddard does not cite to any evidence (e.g., fire patterns) that these Fires were not contained within the respective Dryer cabinets because the plastic components within each Dryer ignited, melted, and leaked outside each Dryer cabinet, causing the Fires to spread. In fact, Mr. Stoddard's only opinion relating to fire containment in these Fires is vague, general, and not related to this case: "In some gas dryer cases, once the burning plastics and other combustibles ignite it leads to an unregulated release of fuel gas that then allows fire to escape the containment of the dryer cabinet and cause further damage to anything surrounding it." Exh. C, (Stoddard Rep., p. 208). Mr. Stoddard does not express any opinion that this occurred in any of these Fires.

Mr. Keefe, who Mr. Stoddard characterizes as the "primary expert in terms of the causes of the fire" in this case (Stoddard Dep. 88:9), testified that in all three Fires the Dryer doors were opened by the owners (Exh. D; Keefe Dep. 120:8-10) and that "there is no indication that the fire spread outside these dryers before the door was opened." (*Id.* at 119:17-24).

Mr. Stoddard, on the other hand, when asked whether fire spread outside of the Dryers before the doors were opened, gave the following, convoluted response:

> Page 141
> 1  Q. Is there -- going back to my earlier question.
> 2     Is there any evidence of fire spreading
> 3  outside of the dryers prior to the dryer doors being
> 4  opened?
> 5  A. What's your definition of fire?
> 6  Q. You're asking me to define fire?
> 7  A. In terms of to answer your question
> 8  accurately, yes. What's your definition of fire?
> 9  Q. Well, you are the expert. How would you
> 10 define fire?
> 11 A. Well, I would also include products of
> 12 combustion, not just visible lights and heat, but also
> 13 the products of combustion.
> 14    So in terms of smoke and other things like
> 15 that, I would need they witnessed smoke before there was
> 16 actual fire witness of the dryer in two of the cases.
> 17 Q. How about aside from smoke, is there any
> 18 evidence of fire spreading outside of any of the three
> 19 dryers prior to the dryer doors being opened?
> 20 A. Well, again, that's why I was asking what your
> 21 definition of fire was.
> 22    Because fire is typically including smoke, so
> 23 you can't just say -- if you are asking about flames,
> 24 then there is no visible flames outside.
> 25    One of the witnesses did observe that the door
>
> Page 142
> 1 latch was glowing when they opened the door, which again
> 2 is also consistent with a failure that would have
> 3 occurred if they had not opened the door.
> 4    But in terms of actual flames visible outside
> 5 of the dryer before the dryer doors were opened, I would
> 6 say no.

Exh. B, (Stoddard Dep. 141:1-142:6); *see also* (Stoddard Dep. 183:24-184:1) ("So I don't think anyone can give you an opinion as to whether or not the opening of the door affects the fire in a specific instance."). Because Stoddard ultimately concludes that there was no evidence that any of the

Fires escaped the Dryers prior to their doors being opened, his opinions that the Dryers failed to contain the Fires (i) are not relevant because in all instances the doors were opened by the owners/insureds; (ii) are plagued by inconsistent testimony between Stoddard and Plaintiffs' "primary expert on the cause of the fires"; and (iii) do not relate to the ultimate opinions concerning what caused the Fires to start in the first place. Therefore, Mr. Stoddard's causation opinions must be excluded for failing to comply with FRE 702.

## II. MR. STODDARD'S OPINIONS CONCERNING THE PRESENCE OR LACK OF WARNINGS OR INSTRUCTIONS SHOULD BE EXCLUDED.

Mr. Stoddard does not have the knowledge, skill, experience, training or education that qualifies him to offer opinions concerning the adequacy—or alleged inadequacy—of Electrolux's warnings and instructions. Specifically, Mr. Stoddard's opinion that Electrolux failed to warn the user of the known fire hazards and provide proper instructions (Stoddard Rep., p. 210) should be excluded.

Mr. Stoddard opines that Electrolux failed to warn users of the risk of fire and could have employed safety devices "such as an airflow monitoring system or an operational cycle counter with a reminder light to service the dryer after a specific number of uses … and a safety device to prevent fires should the need for service be ignored." Exh. C, (Stoddard Rep., p. 8). Mr. Stoddard's proposed operational cycle counter would essentially shut off the dryer if an owner ignored the reminder to service the dryer (requiring the owner to call a trained service technician to reset the counter).

As a threshold matter, Mr. Stoddard is not qualified to offer opinions concerning the sufficiency of Electrolux's warnings or the warnings Mr. Stoddard claims Electrolux should have provided. Mr. Stoddard has a Bachelor of Science degree in arson investigation with a minor in criminal justice. Exh. A, p. 3. (Stoddard CV). He obtained an associate's degree in electromechanical technology in 2012, and an online master of engineering in advanced safety engineering and

management in 2020. He does not have any specialized knowledge or experience in human factors engineering which is required to offer opinions on any warnings Electrolux supposedly should have provided, and which may be helpful to a jury. *See e.g., Donegal Mut. Ins. Co. v. Electrolux North America,* 2010 WL 11509073 at *4 (M.D. Pa. Dec. 22, 2010) ("there is nothing before the Court that would indicate that Stoddard had any specialized experience in human factor engineering that would allow him to give an opinion beyond that of the average layperson.").

Even if Mr. Stoddard was qualified to opine that Electrolux failed to warn end users of known fire hazards and provide proper instructions, he did not reliably apply the scientific method in reaching such conclusions. Mr. Stoddard proffers that Electrolux could have employed an (i) airflow monitor; or (ii) an operational cycle counter. With regard to the airflow monitor, Mr. Stoddard testified that such a device would "possibly" reduce the risk [of fire] (Stoddard Dep. 153:3-10) and further testified that "Electrolux had in two of these dryers they essentially had an airflow monitoring system." Exh. B, (Stoddard Dep. 148:20-25). He further testified that he has personally tested these airflow monitoring systems and they do not work, but he has not documented that finding because he could not get the systems activated, so "[i]t's not a formal test […]." (*Id.* at 150:6-151:2).

Mr. Stoddard's opinion that Electrolux should have employed an operational cycle counter rests on even shakier ground. In his deposition, Mr. Stoddard described the device as follows:

```
 9      Basically, there is two LED lights on the
10  controls there with some labels beside them that would
11  turn on. They would give people kind of a heads up,
12  hey, it's about time for this dryer to be cleaned, you
13  should clean it. That would be a yellow light.
14      And then if you exceed that counter and
15  ignored it, a red light would turn on, but at the same
16  time there would be a green light in there that
17  disconnects the heater. So you can continue to use the
18  dryer, you just can't dry with heat, which is kind in a
19  force of failure that would call for service.
```

Exh. B, (Stoddard Dep. 158:9-19). If the user did not timely call for service, the clothes dryer would essentially shut down; but in the meantime, the user would only be able to use the dryer without heat because the heater would be disconnected. Mr. Stoddard testified that he came up with the idea, and his business partner designed the software and built it. (*Id.* at 158:3-8). He and his business partner tested this mechanism in "a dryer" but otherwise did "just cognitive testing" and talked about how "other appliances incorporate the same type of process and how do people interact." (*Id.* at 158:5-160:17-20). Mr. Stoddard went on to testify "I have the same thing downstairs in my refrigerator with the water filter reminder." To be clear, Mr. Stoddard did not do any testing with his operational cycle counter device to determine the effect it would have on the users of clothes dryers (i.e., whether the presence of this device would alter dryer owners' use and maintenance habits) and whether those habits are altered in a way that decreases the occurrence of dryer fires. His unfounded and untested opinion that Electrolux could have incorporated such a device, therefore decreasing the likelihood of a fire, is not at all the product of reliably applying the scientific method. Furthermore, Mr. Stoddard does not provide evidence of *other* dryer manufacturers who employed the same or similar device at the time the subject Dryers were manufactured. His opinions concerning Electrolux's lack of warnings, and safety measures Electrolux purportedly could have implemented, should therefore be excluded.

### III. TO THE EXTENT MR. STODDARD IS OPINING THAT MANUFACTURING DEFECTS CAUSED THE FIRES, SUCH OPINIONS SHOULD BE EXCLUDED.

Mr. Stoddard's report refers to "the defectively manufactured front drum seal in some cases." Exh. C, (Stoddard Rep., p. 210). In his deposition, Mr. Stoddard testified that "No one can rule out those type of seal defects in contributing to the changes of airflow inside this dryer." Exh. B, (Stoddard Dep. 218:1-5). Although he could point to no evidence suggesting a seal defect in any of the three Dryers in this case, Mr. Stoddard testified that the Curtis and Van Engen dryers "were manufactured

13
Case 2:20-cv-01455-WED   Filed 12/22/23   Page 13 of 16   Document 72

during a time period where Electrolux had a service bulletin about an improper front drum seal. So it is more probable than not that the seal on those dryers would have been worn and compressed in conjunction with that service bulletin." *Id.* at 212:11-19. He further testified, however:

> 22  factor to the poor airflow in the dryer.
> 23      Because no one can assess what it looked like
> 24  before the fire, if there was any damage to those seals,
> 25  if they weren't properly assembled, if the date the
>
> Page 219
> 1  dryer was manufactured, maybe they forgot the put the
> 2  foam seal in altogether.
> 3      No one will ever know because there is no
> 4  physical evidence to the contrary.

(*Id.* at 218:23-219:2).

Here, Stoddard is speculating that two of the Dryers' front seals are related to an Electrolux service bulletin. This is an impermissible leap under FRE 702 and *Daubert*. The Dryers' front drum seals are comprised entirely of felt. Mr. Stoddard cites to no evidence in his report—and was forced to acknowledge during his deposition—that no measurements had been taken of the front drum seals *before* the fire to suggest these seals were compressed and therefore related to that service bulletin. Furthermore, the Dryers' front felt drum seals were consumed in the Fires and therefore could not be examined *after* the Fires to determine whether they were compressed. Mr. Stoddard's complete lack of factual or scientific analysis—and failure to apply the scientific method to any analysis—does not meet the standards required by FRE 702.

Because Stoddard acknowledges that because the subject Dryer's seals were completely consumed by the fire he cannot opine they were defectively manufactured.[2] There is no factual or scientific evidence to support these opinions other than Mr. Stoddard's leap from the manufacturing

---

[2] Consistent with this premise, when asked at his deposition whether the lint screen or filter housing in any of the Dryers were defective, Mr. Stoddard testified, "there is no way anyone could evaluate if there was any prefire damage or anything like that. … They were all burned up." Exh. B, (Stoddard Dep. 216:9-12 – 217:8-11).

dates of the Dryers and the date of the related service bulletin. Credence should not be given to such a leap, particularly where the expert has acknowledged that the component part, to which his testimony pertains, has been completely destroyed and therefore cannot be analyzed to confirm any defect. *See, Daubert I*, 509, 590 U.S. 579 (1993) ("But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony ***must be supported by appropriate validation—i.e., 'good grounds,' based on what is known***."). (emphasis added). Mr. Stoddard's opinions relating to the front drum seals are unsupported and unvalidated, and therefore must be excluded.

Similarly, Mr. Stoddard offers no evidence to support his opinion that the subject Dryers were defectively manufactured because they contained (or may have contained) loose screws, and any such opinions should be excluded. In his deposition, Mr. Stoddard noted, with regard to the Van Engen fire, that there was a "loose screw on the baffle that also helped shift the baffle…". Exh. B, (Stoddard Dep. 224: 1-2). Mr. Stoddard did not do any testing or analysis to support this opinion.

In his report, Mr. Stoddard opines that: "Electrolux knew or should have known that loose screws that attach the ball pivot and metal baffle components to the rear of the drum can unfasten and cause movement of the drum or baffle (respectively) causing them to contact the heating element and short circuit." The report goes on to state that the "[d]etached screw most probably resulted from inadequate torque applied in tightening this screw or excessive torque from over tightening when Electrolux assembled the subject dryer at their factory." Exh. C, (Stoddard Rep., p. 10). To the extent that Mr. Stoddard is opining that any loose or missing screw constituted a manufacturing defect, and that any such defect caused the Fires, such opinions should be excluded as they are not premised on anything more than Mr. Stoddard's recitation of his preexisting opinions and are instead wildly speculative. Mr. Stoddard has offered no evidence *in this case* of any of the subject Fires indicating any screw was loose or missing before the Fires, such that any Dryer drum was loose. Nor has Mr.

15

Stoddard offered any evidence that the baffle on any one of the two electric Dryers became dislodged *before the fire*, contacted the dryer's heating element, arced, and caused the fires in these dryers. *See Daubert,* 509 U.S. at 590 ("[c]onjecture, hypothesis, subjective belief, or unsupported speculation are impermissible bases for expert opinion.").

## CONCLUSION

Mr. Stoddard's proffered opinions concerning the dryers' design defects, manufacturing defects, and Electrolux's warnings and instructions, do not comport with FRE 702 or the *Daubert* standard and therefore should be excluded.

Dated this 22nd day of December, 2023.

                                FOX, O'NEILL & SHANNON, S.C.
                                Attorneys for Defendant

                                      */s/ Electronically signed by Lauren E. Maddente*
                         By: _____
                                LAUREN E. MADDENTE
                                State Bar No. 1101188
                                JACOB A. MANIAN
                                State Bar No. 1064360

P.O. Address:
622 N. Water Street, Suite 500
Milwaukee, WI 53202
Phone: (414) 273-3939
Email: lemaddente@foslaw.com
        jamanian@foslaw.com