UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMERICAN FAMILY MUTUAL INS. CO., S.I., ET AL.

    Plaintiffs,

                                        Case No. 2:20-CV-01455

v.

ELECTROLUX HOME PRODUCTS, INC.,

    Defendant.

**PLAINTIFFS' BRIEF  IN SUPPORT OF MOTION TO
EXCLUDE TESTIMONY OF RICHARD MARZOLA**

## <u>BACKGROUND</u>

This lawsuit arises from three fires caused by residential clothes dryers manufactured by the defendant. The three fires are referred to as the Curtis fire, the Flones fire, and the Van Engen fire. In each case, the fire spread from the dryer to the home and caused damage. Plaintiff American Family Mutual Insurance Company insured the homes and paid for the damages caused by the fire. The Van Engens also are plaintiffs, as they sustained damages in excess of their policy limit.

The plaintiffs are asserting negligence and strict product liability claims against the defendant. They allege that the dryers contained multiple design defects that both caused the fire and allowed the fire to spread outside of the dryer and to the house.

Electrolux named Richard Marzola as an expert witness. As discussed in detail below, he opines that, in all three fires, the cause of the fire was (1) the owners using a flexible (rather than

rigid or semi-rigid) exhaust duct, and (2) improper maintenance. Marzola claims that the use of the flexible duct reduced the velocity of the exhaust gas. The slower exhaust gas, Marzola claims, resulted in excessive lint build-up, and this excessive lint build-up caused the fire.

The problem with Marzola's theory is that, unlike plaintiffs' expert (Mike Stoddard), Marzola did not conduct any testing whatsoever, as required by the scientific method, to determine whether his hypothesis is correct. He readily admits that he does not know what the back-pressure of the exhaust gas was in any of the dryers, and therefore, he does not know if the back-pressure was in excess of what was permitted by Electrolux. Not surprisingly, he admits that he does not know what the velocity of the exhaust gas was in any of the dryers. He simply concludes that the exhaust pressure was high enough to slow down the velocity of the exhaust gas enough to cause excessive lint build-up.

Not only did Marzola not conduct any testing of any kind to support his hypothesis, but he did not consider, let alone test, any alternative reasons for why lint may have built up in the dryer. These alternative reasons (discussed below and in Stoddard's report) cannot be eliminated by Marzola. He simply ignores them. This lack of consideration of, let alone testing to eliminate, the other possible causes, makes his conclusion as to the cause of the lint build-up invalid under the scientific method.

Marzola himself has no experience designing, or testing the design of, residential clothes dryers. He is not qualified to offer the opinions contained in his report. His opinions do not meet the requirements of Rule 702. They are not based on sufficient facts or data, they are not the product of reliable principles and methods (or any principles and methods), and the non-existent

principles and methods were not reliably applied to the facts of this case. Accordingly, the Court should find them not admissible.

## MARZOLA'S OPINION

During his deposition, Marzola testified that the Flones fire was caused when lint was ignited by the dryer's heating element (Marzola dep. 13:6-12, Harmeyer Aff. Exh. 1). (The parties do not dispute this.) What is in dispute is why lint built up in the dryer. Marzola described this hypothesis as follows:

> So I believe that's what's going on here is we have this flexible foil duct, and how it was routed is preventing that complete exhaust that includes, you know, the extra lint and it's backing up in the dryer.

(Marzola dep. 15:13-18, Harmeyer Aff. Exh. 1) The foregoing opinion is repeated in each of the three reports that Marzola prepared for the three fires:

> The use of the flexible foil duct as the transition duct with the Flones electric dryer is not in compliance with the Installation Instructions; therefore, this dryer was not properly installed.

(Marzola's Flones report, Harmeyer Aff. Exh. 2, p. 7. See also Marzola's Curtis report, Harmeyer Aff. Exh. 3, p. 8, and Marzola's Van Engen report, Harmeyer Aff. Exh. 4, p. 7.)

Thus, in each case, Marzola concludes that the use of the flexible foil exhaust duct was installed and routed in such a way that it prevented the complete exhaust of the lint. That is his hypothesis. The problem is that, not only did he not test this hypothesis in any manner whatsoever, but he repeatedly conceded during his deposition that he had no knowledge of whether the installation did, in fact, cause excessive back pressure.

3

## ELECTROLUX'S INSTALLATION REQUIREMENTS

### *The back pressure issue*

There is no dispute that the subject dryers produced exhaust gas that needed to be vented out of the dryer. There also is no dispute that drying clothes creates lint, and the lint needs to be removed from the dryer through the flow of the exhaust gas. Finally, there is no dispute that, as the exhaust gas flows through the exhaust duct, the exhaust gas will create friction with the surface of the duct, and will encounter turns in the duct. The friction and the turns create back pressure.

As discussed in Electrolux's installation manuals for these dryers, and discussed below, Electrolux requires that the duct be installed in such a way to keep the back pressure below an acceptable level. The need for this requirement is not in question: if the back pressure is too high, the velocity of the exhaust gas will slow down, and the gas and lint will not properly flow out of the dryer.

### *The back pressure requirement*

The Electrolux owners manual provides two methods for installing the dryer in a manner to keep the back pressure at an acceptably low level.

The first method provided by the owner's manual is set forth in a table in the manual. The table limits the length of, and the number of turns in, the duct. The following is from the installation manual for the Flones dryer (Marzola depo. Exhibit 7, p. 3; Harmeyer Aff. Exh. 1):

4

| | MAXIMUM LENGTH of 4" (10.2 cm) Dia. Rigid Metal Duct | | |
|---|---|---|---|
| | VENT HOOD TYPE | | |
| | (Preferred) | | |
| Number of 90° Turns | 4" (10.2 cm) | Louvered | 2½" (6.35 cm) |
| 0 | 60 ft. (18.28 m) | | 48 ft. (14.63 m) |
| 1 | 52 ft. (15.84 m) | | 40 ft. (12.19 m) |
| 2 | 44 ft. (13.41 m) | | 32 ft. (9.75 m) |
| 3 | 32 ft. (9.75 m) | | 24 ft. (7.31 m) |
| 4 | 28 ft. (8.53 m) | | 16 ft. (4.87 m) |

| | MAXIMUM LENGTH of 4" (10.2 cm) Dia. Flexible Metal Duct | | |
|---|---|---|---|
| | VENT HOOD TYPE | | |
| | (Preferred) | | |
| Number of 90° Turns | 4" (10.2 cm) | Louvered | 2½" (6.35 cm) |
| 0 | 30 ft. (9.14 m) | | 18 ft. (5.49 m) |
| 1 | 22 ft. (6.71 m) | | 14 ft. (4.27 m) |
| 2 | 14 ft. (4.27 m) | | 10 ft. (3.05 m) |
| 3 | NOT RECOMMENDED | | |

The second method states that, if the installation is not shown in the table above, then the back pressure must be measured:

> The system back pressure MUST NOT be higher than 0.75 inches of water column. If the system back pressure is less than 0.75 inches of water column, the system is acceptable.

(Marzola depo. Exhibit 7, p. 3; Harmeyer Aff. Exh. 1).

5

### *The prohibition of flexible ducts*

Consistent with the foregoing, the installation manual provides the following:

> Excessive lint can build up inside exhaust system and create a fire hazard and restrict air flow. Restricted air flow will increase dryer times. If your present system is made up of plastic duct or metal foil duct, replace it with a rigid or flexible metal duct.

(Marzola depo. Exhibit 7, p. 3; Harmeyer Aff. Exh. 1).

In his deposition, Marzola explains the reason behind this requirement and how, in his opinion, it applies to this case:

> So my criticism with the installation is -- is  the use of the flexible foil duct and *how easily that can be crushed* or how it is  installed, *how many bends and turns that can happen* through -- through that flexible foil. So what happens is when *you have this crushing, you have a lot of these bends and turns*; you're not going to be able to exhaust all of the lint and hot air from the dryer and exhaust it out, you know, properly through the -- what we call the transition duct and then ultimately outside. So what goes on there is when you aren't able or when the dryer is not able to exhaust that it will either back up into the actual transition duct or it will actually back up into the dryer cabinet. So I believe that's what's going on here is we have this flexible foil duct, and *how it was routed is preventing that complete exhaust that includes, you know, the extra lint and it's backing up in the dryer*.

Marzola dep. 14:23 - 15:18; Harmeyer Aff. Exh. 1)

The problem with Marzola's opinion is that he never tested his hypothesis that the use of the flexible duct in these cases resulted in crushing and excess back pressure. He says that "I believe that's what's going on here," but he has no evidence of it.

## MARZOLA FAILED TO TEST HIS HYPOTHESIS.

During his deposition, Marzola was questioned at length regarding the bases of his opinion and what fact he relied on to support it. He testified as follows:

***Marzola did not attend any fire scene exam.***

Marzola's proffered opinion is that "how [the exhaust duct] was routed is preventing that complete exhaust." Certainly, going to the fire scene exams and observing how the ducts were, in fact, installed, may have provided Marzola with facts about how the ducts were routed. But he did not go to any scene exam:

> Q. Okay. Did you attend this [Flones] fire scene exam?
>
> A. I did not, no.
>
> Q. . . . have you spoken with anyone who patricide in the joint scene exam?
>
> A. Other than Mr. Keefe when I did the lab exam with him, no, I did not speak with anybody from EFI Global.
> . . .
> Q. And do you have any recollection of that conversation?
>
> A. Not specifically . . . I honestly can't remember unless we look at the photos, but — but no, I really don' I this particular matter.

(Marzola dep. 18:22 - 20:3; Harmeyer Aff. Exh. 1)

> Q. . . . Did you go to this [Curtis] scene . . .?
>
> A. I did not, no.

(Marzola dep. 131:3-4; Harmeyer Aff. Exh. 1)

> Q Okay. Did S-E-A have a -- have a CFI go to this [Van Engen] scene?
>
> A We did not, no.

(Marzola dep. 173:8-10; Harmeyer Aff. Exh. 1)

7

## *Marzola does not know how the Flones duct was installed.*

Given that Marzola did not attend the Flones scene exam, and does not recall any conversation with any who did attend, it is not surprising that he does not actually have any knowledge of how the Flones duct was installed:

> Q. . . . But what I want to know is if you have knowledge of any actual specific facts on how this duct was actually installed.
>
> A. I would say I don't believe we do. I don't particular [sic] and I don't recall there being any testimony to say something other than what I think I just described, is that it kind of went from Point A to Point B. I'm not being told or I haven't read anything different than that.
>
> Q. All right. But you haven't read that either, though, have you?
>
> A. Correct. No. That is true. That is true. There's been no true -- that I recall, any direct testimony that describes the exact routing that I can recall.

(Marzola dep. 21:20 - 22:10; Harmeyer Aff. Exh. 1)

> Q Do you have knowledge of any facts of how that flexible foil was, in fact, routed from the dryer to the hole?
>
> A No.

(Marzola dep. 26:2-5; Harmeyer Aff. Exh. 1)

So it is undisputed that Marzola has no idea how the Flones duct was installed.

## *Marzola has no evidence that the Flones duct was bent or crushed.*

Keeping in mind that Marzola's opinion is that the three fires were caused by "the use of the flexible foil duct and how easily that can be crushed or how it is installed, how many bends and turns that can happen through -- through that flexible foil," Marzola dep. 14:23 - 15:18;

Harmeyer Aff. Exh. 1), it must be noted that Marzola has no knowledge of any fact to support the

claim that the Flones duct was — in fact — crushed or bent:

> Q Okay. And I don't see any photos in your report showing any
> bent coils, so let me ask. Did you find any bent coils?
>
> A As we sit here today, I mean, without maybe looking over the
> photos a little clearer, I don't recall there being what I would say is
> an actual bent coil, if you will.
> . . .
> Q. . . . If it's crushed would you expect to see bent coils?
>
> A.  I'd say that's accurate. . . .
> . . .
> A. . . .I don't know that there's any physical evidence I could point
> to that we had any kind of crushing, if you will, to the -- to the -- to
> the foil, if you will, the foil duct.

(Marzola dep. 28:10 - 30:8; Harmeyer Aff. Exh. 1). So Marzola concludes the fires were caused

by crushed or bent exhaust ducts even though he has no evidence whatsoever that the exhaust

ducts were crushed or bent.

> ### _Marzola conducted no test to determine the back pressure in the Flones exhaust duct, and cannot say if the back pressure exceeded allowable limits._

It must be remembered that the reason a crushed or bent exhaust duct is a problem is

because it will increase back pressure past the acceptable limit. Marzola has no idea whether the

back pressure in the Flones duct exceeded that limit:

> Q So did you do any testing or investigation into how much
> backpressure was being created by the Flones's installation?
> . . .
> THE WITNESS: No. I don't know that anybody could recreate
> that.

(Marzola dep. 40:23 - 41:3; Harmeyer Aff. Exh. 1)

Q And the reason they don't want anyone to use that flexible duct is because of the risk of increased backpressure, correct?

A That is accurate. The crushing, exactly, yes.

Q So, I mean, I understand your point that Electrolux warns against it because of the risk that it can increase backpressure. I'm just trying to find out if -- if anyone has any opinions that, in fact, the Flones's backpressure was greater than .75 inches of water column.

A I would say that no one has tested that to determine that one way or the other.

(Marzola dep. 41:19 - 42:6; Harmeyer Aff. Exh. 1).

So Marzola opines that the cause of the fires were excessive back pressure in the ducts, yet he admits he has no idea what the back pressure actually was.

### *Marzola admits he did not test his hypothesis.*

It must be remembered that the Electroluxs installation manual expressly states "If the system back pressure is less than 0.75 inches of water column, the system is acceptable." (Marzola depo. Exhibit 7, p. 3; Harmeyer Aff. Exh. 1). Marzola opines that the use of the flexible duct created excessive back pressure, resulting in lint buildup. This opinion begs the question: Did Marzola test his hypothesis to confirm it?  The answer is no:

Q Okay. But we don't know what the backpressure was.

A We don't know what the backpressure was.

Q And is there any evidence based on testing of a hypothesis that it was greater than .75?

A I would say no.

(Marzola dep. 43:16-21; Harmeyer Aff. Exh. 1).  Without any testing, Marzola has no basis to

reach the conclusion he reached.

### *Marzola has no evidence that the Curtis exhaust duct was crushed or bent.*

As with the Flones duct, Marzola has evidence to support any conclusion that the Curtis

duct was bent, crushed, or otherwise in a condition that would result in excessive back pressure:

> Q. And in that 180-degree turn do you opine whether the diameter
> of the duct is reduced because of the way it's turned in that photo,
> if you know?
>
> A. That's why I'm just looking at it closer to see. I mean, nothing
> jumps out at me that it's -- if it's reduced it's not a significant
> amount because it kind of looks like it's still holding its shape. But
> I would say I don't see any red flags at this moment.

(Marzola dep. 133:14-23; Harmeyer Aff. Exh. 1)

> Q. And certainly at the -- on the far left-hand side the end that
> connects to the dryer in the -- in the first foot or two coming out of
> there there's no sign of crushing?
>
> A. Not that is jumping out. I mean, there is some little different
> shading there going on, but I don't know if that's just the shading of
> the light and the reflection of the photograph or if there's some,
> you know, slight manipulation of those wires. So I'm not quite
> sure. But there's nothing gross that I can see at this moment.

(Marzola dep. 137:8-19; Harmeyer Aff. Exh. 1)

So Marzola has no factual basis to conclude the Curtis duct was restricted in any way. He

admits this.

### *Marzola did not determine whether the Curtis duct installation*
### *exceeded the back pressure requirements of the installation manual.*

It must be remembered that the Electrolux's installation manual expressly states "If the

system back pressure is less than 0.75 inches of water column, the system is acceptable."

11

(Marzola depo. Exhibit 7, p. 3; Harmeyer Aff. Exh. 1). Marzola admits he has no factual basis to

conclude, and conducted no testing to confirm, whether the Curtis duct was creating excessive

back pressure:

> Q. And with regard to the Curtis installation of the dryer, did you
> or anyone at S-E-A or anyone else that you are aware of attempt to
> do any testing to determine what the actual pressure in that
> particular system was as installed?
>
> A. Well, no, because it wasn't installed, obviously, I'm sure, when
> they got there. It was already modified. It was already, you know,
> disassembled, so I don't know that anybody could do any testing.
>
> Q. Okay. So given the length, given the number of angles, given
> the fitting on the outside termination end, given the condition of it,
> are you able to say one way or another whether or not the pressure
> inside that duct during dryer operation was in excess of .75 inches
> water column?
>
> A. No, I don't believe we can say that, anybody can say that here,
> that it was or wasn't. . . .

(Marzola dep. 141:15 - 142:8; Harmeyer Aff. Exh. 1)

> Q. …As far as the actual pressure in the Curtis exhaust as installed,
> you didn't do any testing to try and determine that?
>
> A. No, no, I did not, and I don't know that we can because we don't
> know the exact routing.

(Marzola dep. 162:22 - 163:2; Harmeyer Aff. Exh. 1). Thus, it is undisputed that Marzola admits

that he cannot say the Curtis duct was creating excessive back pressure.

**_Marzola performed no test to determine if there was_**
**_an excessive amount of lint in the Flones or Curtis dryers._**

Marzola's hypothesis is that excessive back pressure in the ducts led to excessive lint in the dryers. But Marzola admits he never tested his hypothesis to determine whether there was, in fact, excessive lint in the dryers:

> Q. I assume I know the answer to this, but with regard to the quantity of lint in the Curtis dryer at the time of the fire, is there any way to quantify that?
>
> A. Again, similar to what we talked about in Flones, I mean, there's, you know, we did lose some lint because of just, you know, the fire itself, so to have a snapshot of what it looked like right before the fire ensued, no, _I don't believe any of us know that_.

(Marzola dep. 159:3-12; Harmeyer Aff. Exh. 1)

> Q But fair to say you've done no testing or research to determine what amount you would get after 11 years?
>
> A Exactly. And, again, it's variable. Like we said, it's really going to be variable on the use of the dryer, but that is, again, _it's a pretty big unknown_.

(Marzola dep. 161:5-11; Harmeyer Aff. Exh. 1). So Marzola has no idea how much lint actually built up in the dryers as installed, nor how much would build up if they were installed with a rigid duct. Therefore, he has no basis to conclude that the use of the flexible duct caused "excessive" build up of lint.

**_Marzola performed no testing to confirm his hypothesis relating to the Van Engen fire._**

As with the Flones and Curtis fires, Marzola performed no testing to confirm his hypothesis as applied to the Van Engen fire:

13

Q . . . Have you ever or has S-E-A ever or has anyone that you know of ever done any testing to understand the cause and effect of reduced airflow and sagging elements?

A I know we have done some testing, S-E-A here, because I was involved in it with electric furnaces early in my career. I don't recall if that was something we were looking at, so I can't -- I can't speak for that. I have not sought out papers, if you will, or anybody doing testing that might be looking to specifically identify that or have tested that. So I -- *I don't recall seeing any, but I don't recall looking for them either*.

(Marzola dep. 170:20 - 171:9; Harmeyer Aff. Exh. 1)

### *Marzola cannot say if the Van Engen duct was crushed or had a reduced diameter.*

Marzola performed no tests, and has no facts that would allow him to conclude that the Van Engen duct was, in fact, crushed or had a reduced diameter:

Q. And is there any way for anybody -- well, someone may know, but is there any way for you to know if that crushing occurred prior to the fire or as part of the fire suppression efforts or during or post fire?

A. I mean, to answer your question, no, we don't know when that occurred.

(Marzola dep. 187:3:9; Harmeyer Aff. Exh. 1)

Q. Right. So you have these concerns, but as far as how it actually was installed, you don't know, correct?

A. Well, nobody knows, but it had -- it had to have at least more than one vent because of how long it is.

(Marzola dep. 189:1-6; Harmeyer Aff. Exh. 1). So Marzola admits that he has no idea if the Van Engen duct was crushed, but nonetheless opines that the Van Engen fire was caused by excessive lint build up which was caused a crushed duct reducing the exhaust velocity.

### *Marzola's cognitive "test" was no test at all.*

While it certainly is acceptable for experts to perform a cognitive (as opposed to a physical) test of their hypotheses, the problem with Marzola is that he did not even do that. He described his cognitive "test," which revealed that he simply drew an analogy:

> Q. . . . how did you test that hypothesis?
>
> A. Just through, I mean, cognitively through my experience of doing these cases I've seen where they've been installed in a fashion where it does reduce that 4-inch diameter. So I'm drawing my experience to -- to assist with that analysis.
>
> Q. So because in other installations you've seen the diameter reduced your cognitive test is that in the Flones case it was reduced?
> . . .
> THE WITNESS: I would say that's accurate, yes. I've seen installations very similar where you're up on a wall, you know, in the side like that. So, yes, I would say that I have seen that and that's where I'm drawing from my experience.

(Marzola dep. 36:10 - 37:2; Harmeyer Aff. Exh. 1) The obvious problem with this "cognitive test" is that Marzola proceeded as follows:

- He investigated other dryers where the duct had a reduced diameter.

- In those cases, there were fires.

- In Flones, Curtis and Van Engen, there were fires.

- Therefore, Flones, Curtis and Van Engen must have had reduced diameter ducts.

This is the classic logical fallacy of affirming the consequent (if A, then B; B, therefore A). It is not a cognitive test of any kind.

15

Marzola cannot perform a cognitive test on any of these fires because, as he admits, he has no knowledge of how the ducts were installed, what the back pressures in the ducts were, or how much lint was accumulated in any of the dryers.

## APPLICABLE LAW

When ruling on a motion to prohibit expert testimony, the applicable law is well known. The court must determine whether the expert's proffered testimony "has a sufficiently reliable foundation to permit it to be considered." *Amorgianos v. National Railroad Passenger Corp*., 303 F.3d 256, 265 (2d Cir. 2002), quoting *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 at 597 (1993).

Factors to be considered in determining reliability include whether (1) the testimony is grounded on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. F.R.E. 702.

Additional factors that bear on reliability include whether a theory has been tested, whether it has been subjected to peer review and publication, the potential rate of error, and whether it has gained general acceptance in the relevant scientific community. *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002) citing *Daubert*, 509 U.S. at 593.

Testing is the hallmark of reliable scientific method. "Scientific methodology is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593 (citation omitted). Where an expert's testimony is not supported by testing or published in peer review materials, courts will exclude such testimony. *Pozefsky v. Baxter Healthcare Coip*., 2001

WL 967608 (N.D.N.Y. 2001) (testimony of plaintiffs two experts excluded where opinions were not scientifically reliable because, inter alia, they were not tested, subjected to peer review or created through the use of definable scientific methodology); see also *LaBarge v. Joslyn Clark Controls, Inc*., 242 Fed. Appx. 780 (2d Cir. 2007); *Toole v. Toshin Co.*, 2004 U.S. Dist. LEXIS 30061 (W.D. New York 2004) ("an experts testimony must be grounded in the methods and procedures of science, and must be more than unsupported speculation or subjective belief").

### MARZOLA'S OPINIONS DO NOT MEET THE REQUIREMENTS OF RULE 702

#### *Marzola is not qualified to offer his opinions in this case.*

The first requirement of Rule 702 is that the witness be "qualified as an expert by knowledge, skill, experience, training, or education." Given his specific opinions in this specific case, Marzola does not meet this requirement.

A review of Marzola's CV (Harmeyer Aff. Exh. 5) reveals the following. He is a professional engineer who received his bachelor's degree in electrical engineering in 1992. He is certified as a fire investigator. He worked for one company for less than a year involving control systems. He worked as a second company for three years "managing products for a discreet input/output control network (bust system)." Since 1996, he has worked at SEA Ltd. investigating electrical faults and malfunctions.

There is no evidence in Marzola's resume that he has ever conducted any design work relating to residential clothes dryers, nor is there any evidence that he ever tested any design relating to a dryer.

Specific to his opinions that are the subject of this motion, there is no evidence that Marzola has any education, training or experience relating to the causes of lint build up in dryers,

or the effect of the diameter of ducts on the velocity of exhaust gas. As discussed above, he has not performed any such testing himself.

The fact that Marzola has investigated numerous Electrolux dryer fires does not make him qualified to offer the opinions he is offering in this specific case. It is not enough that an expert possesses some manner of general expertise. An engineer is not necessarily qualified to opine on all engineering questions. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("Simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects."). What matters under Rule 702 is whether the expert is qualified to answer the specific question presented. See *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

Marzola is an electrical engineer. No one is alleging an electrical failure of the dryer. In other dryer fire cases, he may be qualified to offer opinions if the cause is an electrical malfunction. But no one is alleging that in this case.

In this case, Marzola does not have the qualifications to offer testimony as to why there was excessive lint build up, and what effect (if any) the use of a flexible (vs. rigid) exhaust duct had on the cause of the fire.

Given the foregoing, Mazola does not have the knowledge required by Rule 702(a) to "help the trier of fact to understand the evidence or to determine a fact in issue."

### *Marzola's testimony is not based on suffcient facts or data.*

The second requirement of Rule 7902 is that "the testimony is based on sufficient facts or data." In this case, Marzola's lack of fact and data is astounding. Consider:

- He never went to a fire scene exam.

- He has no recollection of any conversation with anyone about the fire scene exams.

- He conducted no testing.

- He produced no data.

- He does not know how the ducts were installed in each dryer.

- He does not know whether any of the ducts were crushed or bent, and if so how much.

- He has no data on any reduction of exhaust gas velocity (if any).

Simply put, Marzola's conclusion that these fires were caused by the use of flexible ducts reducing exhaust gas speeds and creating "excessive" lint is not based on sufficient facts or data.

### *The testimony is not the product of reliable principles and methods.*

Even if Marzola were qualified, and did have any facts or data, his opinions are not admissible because they are not based on reliable principles and methods. See *Timm v. Goodyear Dunlop Tires N. Am., Ltd*., 932 F.3d 986, 994 (7th Cir. 2019) ("even a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method'" (quoting *Smith*, 215 F.3d at 718)). As discussed below, Marzola's opinions are not based in any recognized scientific method.

### *Whether the particular scientific theory can be (and has been) tested*

As a reminder, Marzola's hypothesis is:

> So I believe that's what's going on here is we have this flexible foil duct, and how it was routed is preventing that complete exhaust that includes, you know, the extra lint and it's backing up in the dryer.

(Marzola dep. 15:13-18, Harmeyer Aff. Exh. 1). Marzola certainly could have tested his theory, but chose not to. He could have attached a flexible duct to an exemplar dryer, bent it and crushed

19

it, and measured what impact that had on the velocity of the exhaust gas and lint build up in the dryer. He did not do this.

Given this complete lack of testing, the plaintiffs cannot even cross-examine Marzola on the methods and validity of the testing, or question the test results. There is no test, and no results, to dispute. This leaves Marzola declaring his hypothesis correct, and the plaintiffs having nothing to question. This is a classic *ipse dixit* situation.

### Whether the theory has been subjected to peer review and publication

Marzola's hypothesis has not been subjected to any peer review or publication. Obviously, there is nothing for Marzola to submit to peer review or publication because he has not published any test results.

Certainly, Marzola could have published a paper in which he set forth his hypothesis, testing and conclusion regarding the effect of using a flexible duct on lint build up in dryers. But he did not do this.

### The known or potential rate of error

In this case, there is no known or potential rate of error because there is no test in the first place. Marzola has presented nothing more than: he has seen an indeterminate number of dryer fires where the exhaust duct was crushed, and a crushed exhaust duct can lead to excessive lint build up and fires. There is no way for the court to evaluate the potential error rate of Marzola's hypothesis because there is no data.

<u>*The existence and maintenance of standards controlling the technique's operation*</u>

There is no standard controlling Marzola's technique's operation because there is no technique. He simply concludes in his head that this is what happened. There is no way to evaluate his testing against a standard.

<u>*Whether the technique has achieved general acceptance*</u>
<u>*in the relevant scientific or expert community*</u>

Marzola's technique, such as it is, has not achieved general acceptance in the relevant scientific or expert community. There is no evidence that his technique is even known to any relevant scientific or expert community. Certainly, saying that *I've seen other dryer fires where the duct was crushed, and these dryers caught fire, so therefore, they ducts must have been crushed, and that must have been the cause of the fire*, is not a technique widely adopted in the scientific community.

### <u>Marzola's opinions do not reflect a reliable application of the principles and methods to the facts of the case.</u>

The final requirement of Rule 702 is that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." In this case, Marzola's opinions do not meet this requirement. Marzola never applied any principles and methods to the facts of this case.

Regarding the first half of the requirement, Marzola's opinions are devoid of any principal or method. He did nothing more than go to the lab exam, look at the artifacts and reach a conclusion. (Of course, Marzola will claim that he read discovery responses, deposition transcripts and other documents. But reviewing these documents is not the application of any principle.)

21

Regarding the second half, Marzola never bothered to gather the necessary facts to which principles could be applied. He admits that he does not know how the ducts were actually installed. He does not know if they were crushed or bent. He does not know how much (if at all) the velocities of the exhaust gases were reduced. He simply has no facts to which he can apply any principles or methods.

When all of the foregoing is considered, it is clear that Marzola's opinions are not "based upon some recognized scientific method." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019), quoting *Smith*, 215 F.3d at 718. They are nothing more than Marzola telling us what his gut tells him happened.

## MARZOLA FAILED TO CONSIDER ALTERNATIVE CAUSES OF LINT BUILD-UP

In his report, plaintiff's expert, Mike Stoddard, discusses the testing he performed to identify the causes of lint build up in the defective Electrolux dryers. (Harmeyer Aff. Exh. 6). For example, at p. 41, Stoddard states:

> Air leakage is another major factor in the accumulation of lint within the dryer cabinet. The path of airflow is meant to carry the heated air into the tumbling laundry load and then exhaust the moisture laden air, and any lint that may not have been captured by the lint screen, into the exhaust ductwork and ultimately to the exterior of the structure. Any openings, gaps or improper seals allow air leakage that reduces airflow throughout the dryer, which contributes to the collection of lint behind the drum in the subject Electrolux dryers.
>
> In the subject Electrolux brand dryers, key places where air leakage occurs includes:
>
> 1. The interface between the front of the drum and the front panel sealed by a combination of plastic glides and felt gasket material.
>
> 2. The interface between the lint trap, trap duct and front panel.

3. The junction between the blower housing and trap duct, sealed by a piece of foam sandwiched between these two components.

4. The junction between the internal exhaust pipe and blower housing, sealed by a wide rubber band surrounding this interface.

Stoddard discusses at p. 42 of his report the fact that Electrolux's own service bulletin addresses the fact that "a defective seal on the door, an improper seal at the drum glide or drum seal, or the air duct seal between the fan cover located on the fan housing" can cause short cycling and disrupt the air flow.

Marzola never considered any of these alternatives. He never formed any hypotheses relating to these other known causes of lint build up, and he never tested them.

The fact that he gave these other possible causes no consideration whatsoever, while at the same time not testing his own, sole hypothesis, leads to the conclusion that the scientific method was not followed and Marzola has no basis to conclude any one hypothesis is more, or less, valid than any other.

## **CONCLUSION**

For the foregoing reasons, the court should bar Richard Marzola from testifying as to the opinions set forth in the motions filed herewith.

Date: December 22, 2023

RON HARMEYER LAW OFFICE LLC
Attorneys for Plaintiffs


*/s/ Ronald W. Harmeyer*
Ronald W. Harmeyer
State Bar No. 1026579

330 E. Kilbourn Ave., Suite 1070
Milwaukee, WI 53202
Tel. (414) 316-2500
Fax (414) 755-7081
rharmeyer@ronharmeyerlaw.com