UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., and
NICHOLAS AND ELIZABETH VAN ENGEN,

        Plaintiffs,

vs.

Case No. 2:20-cv-01455

ELECTROLUX HOME PRODUCTS INC.,

        Defendant.

**DEFENDANT, ELECTROLUX HOME PRODUCTS, INC.'S, MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF RICHARD MARZOLA**

    Defendant, Electrolux Home Products Inc. (hereafter, "Electrolux"), by its undersigned counsel, hereby responds to Plaintiffs' Motion to Exclude Testimony of Richard Marzola (Doc. 74, 75) (the "Motion"). The Motion seeks to bar Electrolux's expert, Richard Marzola, from testifying in this case.

**ARGUMENT**

    Plaintiffs' Motion relies on a patchwork of deposition transcript excerpts intended to paint the picture that Mr. Marzola, Electrolux's expert, does not have the requisite credentials to render opinions in this case, relied on "zero testing" of Electrolux dryers, and did not reliably apply principles and methods to the facts underlying each of the dryer fires in this case. That picture, however, is inaccurate—Mr. Marzola, a Registered Professional Engineer (PE)[1] and Certified Fire Investigator (IAAI-CFI) with decades of experience—relied on a thorough review of (i) notes and

---

[1] To become a PE one must obtain a four-year engineering degree, work under a PE for four years, pass two competency exams, and earn a state license. National Society of Professional Engineers, *What is a PE?*, WWW.NSPE.ORG, https://www.nspe.org/resources/licensure/what-pe (last visited Jan. 10, 2024).

1

photographs taken at each of the scene examinations, (ii) his observations at the laboratory examinations, (iii) the case specific material, including fire department reports and deposition transcripts, (iv) Electrolux testing material, and (v) the wealth of knowledge he has accumulated during his 27-year career, in rendering his opinions in this case. Such opinions should not be limited or excluded.

### I. RICHARD MARZOLA'S KNOWLEDGE, SKILL, EXPERIENCE, TRAINING, AND EDUCATION QUALIFY HIM TO TESTIFY AS AN EXPERT IN THIS CASE.

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by **knowledge, skill, experience, training, or education** may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

(emphasis added). Moreover, the expert's opinions are only relevant if they will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1983). The instant case involves three separate house fires that occurred on March 15, 2018 at the Curtis household (the "Curtis Fire"), November 9, 2017 at the Flones household (the "Flones Fire"), and February 3, 2018 at the Van Engen household, (the "Van Engen Fire") (collectively, the "Fires") (the three dryers are collectively referred to as the "Dryers"). Plaintiffs offer the opinions of Michael Stoddard, a fire and engineering analyst (Exh. A (Stoddard CV)) and Mr. William Keefe, a mechanical engineer (Exh. B (Keefe CV)), both of whom argue that the Fires were caused by design defects in the Dryers. Exh. C (Keefe Rep. pp. 3-5); Doc. 76-6

(Stoddard Rep. pp. 208-210). Electrolux's expert, Richard Marzola, a Registered Professional Engineer and Certified Fire Investigator, opines that the Fires were caused by the insured's respective failures to properly install and maintain each of the Dryers. Liability in this case depends on the cause of the Fires.

Mr. Marzola is a licensed Professional Engineer and Certified Fire Examiner with over 27 years of experience. He estimated that he's investigated between 80 and 100 Electrolux ball-hitch dryer fires in the course of his career. Doc. 76-1 (Marzola Dep. 9:22-23). In his current role as a Senior Electrical Engineer for SEA, Ltd., his duties include analyzing various types of appliances "onsite and/or in the laboratory to determine the cause or result of an incident (i.e., fire, equipment damage, or personal injury)." Doc. 76-5 (Marzola CV). Plaintiffs' argument that Mr. Marzola is not qualified is unconvincing. *See* Doc. 75 (the Motion pp. 17-18).

Plaintiffs argue that Mr. Marzola "has no experience designing, or testing the design of, residential clothes dryers." *Id*. at 2. Yet, Plaintiffs do not explain why an expert requires experience designing or testing the design of residential clothes dryers to opine regarding the origin and cause of a fire involving the same, nor do Plaintiffs state generally what qualifications they claim Mr. Marzola is lacking that prevent him from being able to render such opinions. In fact, Plaintiffs ignore entirely that in his current role, among Mr. Marzola's duties is analyzing appliances involved in accidents to determine the cause or result of the accident. Moreover, Plaintiffs' reliance on *Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir. 2020) is wholly unconvincing and misguided. *See* Doc. 75 (the Motion p. 18). In *Gayton,* the Seventh Circuit upheld the district court's decision to exclude the proffered expert's opinion concerning whether plaintiff would have survived had prison officials provided her with certain heart medications earlier, because the proffered expert agreed that he did not have any specific training or education regarding the short-term efficacy of the plaintiff's

3

heart medication. *Gayton,* 593 F.3d 610, 613. There is no parallel to be drawn here.[2] The *Gayton* court excluded that plaintiff's expert's opinions because the expert himself testified he did not have specialized cardiac or pharmacological knowledge upon which to base his conclusions. *Id.* at 618. In this case, there is no question that a Registered Professional Engineer and Certified Fire Examiner has the specific training, education, and expertise to analyze the subject Dryers and develop opinions as to the origin and cause of the Fires. Mr. Marzola's education, training, and extensive experience in working as an engineer and fire investigator, specifically, investigating 80 – 100 ball hitch dryer fires, no doubt qualify him to opine on the cause and origin of a residential dryer fire.

## II. RICHARD MARZOLA'S OPINIONS ARE BASED ON SUFFICIENT FACTS AND DATA AND REFLECT A RELABLE APPLICATION OF HIS PRINCIPLES AND METHODS TO THE FACTS OF THE CASE.

Mr. Marzola's opinions in this case reflect a reliable application of his principles and methods to the facts underlying the Fires. Plaintiffs' argument is flawed—Mr. Marzola did not need to know the backpressure of the exhaust gas in any of the Dryers at the time of the fire, the velocity of the exhaust gas at the time of the fire, or the exact manner in which the Dryers were installed, to opine that the excessive lint built up in the Dryers was the result of the Dryers being improperly installed and improperly maintained. Mr. Marzola's opinion that the Dryers were improperly installed stems primarily from the fact that all of the Dryers were installed with flexible foil ducts, which is not in compliance with Electrolux's installation instructions. Doc. 76-2 (Flones Rep. p. 37); Doc. 76-3 (Curtis Report p. 43); Doc. 76-4 (Van Engen Rep. p. 38). In his reports, Mr. Marzola thoroughly explained why and how the use of flexible foil ducts affects the buildup of lint inside the dryer cabinet. Doc. 76-2 (Flones Rep. pp. 36-38); Doc. 76-3 (Curtis Report p. 42-44); Doc. 76-4

---

[2] Plaintiffs' reliance on *Pozefsky v. Baxter Healthcare Corp.*, 2001 WL 967608 (N.D. N.Y.), an unreported District of New York case concerning failed breast implants whereby the court precluded two non-medical doctors who developed their theories solely for the litigation, is equally unpersuasive.

4

(Van Engen Rep. p. 38-40). Regardless of the specific velocities and back pressures that resulted, each of these three Dryers were installed improperly, with the wrong material exhaust ducts. Moreover, using his engineering and fire investigation experience, and analyzing Electrolux lint testing documents and scene and lab examination materials for the subject Fires, Mr. Marzola opines that the Dryers were improperly maintained (not discussed in Plaintiffs' brief): each of the Dryers exhibited lint accumulation inside exhaust ducts, which led to lint accumulation inside the Dryers, indicating the homeowners failed to properly clean those areas. Furthermore, the homeowners did not have the respective Dryers cleaned by an authorized servicer, contrary to Electrolux's maintenance instructions, which warn the homeowners of a risk of fire due to failure to clean lint build-up from the exhaust duct and interior of the dryer. Doc. 76-3 (Curtis Rep. p. 50); Doc. 76-2 (Flones Rep. pp. 43-44); Doc. 76-4 (Van Engen Rep. pp. 46-47); Exh. D (Curtis Dryer Owner's Guide pp. 2, 4); Exh. E (Flones Dryer Use & Care Guide pp. 3, 5); Exh. F (Van Engen Dryer Use & Care Guide pp. 3, 5).

In performing his work on this case, Mr. Marzola reviewed Electrolux testing documents, numerous other documents from Electrolux's "Master Production," the applicable scientific standards, and documents and logs pertaining to each of the Fires' scene examinations, laboratory examinations—which he attended and participated in—and witness interviews and depositions. Then, pursuant to NFPA 921, he formulated hypotheses, tested those hypotheses, and arrived at his conclusions. Mr. Marzola's opinions are reliable because they are based on sufficient facts and data.

### A. Mr. Marzola Performed a Thorough Review of Testing Documents and Other Material in Performing his Analysis in this Case.

Plaintiffs' assertion that "Marzola did not conduct any testing whatsoever…" which is a significant part of Plaintiffs' argument, is false. *See* Doc. 75 (the Motion p. 2). As a threshold matter, that Mr. Marzola couldn't test the Dryers' backpressure and couldn't know with 100%

certainty how the Dryers were installed (due to the destruction caused by the Fires and potential movement of the Dryers) does not mean that "Marzola did not conduct any testing … to determine whether his hypotheses is correct." Doc. 75 (the Motion p. 2). On the contrary, unlike Mr. Stoddard, Mr. Marzola attended and participated in the laboratory examinations of each of the Dryers. He also performed cognitive testing to evaluate his hypotheses. Doc. 76-1 (Marzola Dep. p. 36).

In conducting his analysis, Mr. Marzola reviewed the following materials: fire investigation guides including NFPA 921, fire department incident reports, deposition transcripts, Plaintiffs' experts' reports, case pleadings and discovery, various reports and articles, the "Webster City Lint Accumulation Tests," documents included in Electrolux's "Master Production," bills of materials for each of the Dryers, the Dryers' owners guides, installation instructions, warning labels, customer checklists and wiring diagrams, Electrolux Comparative Lint testing document, ANSI/CSA standards, and other applicable standards. Doc. 76-3 (Curtis Rep. p. 10). Regarding the Curtis fire, Mr. Marzola explains that his conclusions regarding the cause of the Fire are "[b]ased upon the scene and laboratory examinations of the Curtis gas dryer and information reviewed, including a comprehensive evaluation of all competent ignition sources and scenarios identified within the area of origin […]." Doc. 76-3 (Curtis Report p. 50); (*see also*, Doc. 76-2, (Flones Rep. p. 43), basing analysis on laboratory examination of the Flones electric dryer and information reviewed and Doc. 76-4 (Van Engen Rep. p. 46), basing analysis on laboratory examination of the Van Engen electric dryer and information reviewed).

When questioned in his deposition about the comparative lint testing that he relied on, Mr. Marzola explained the testing and the portion of the testing on which he relied:

> … I relied on the second part of the testing where Electrolux was basically comparing just their own dryer – their own dryer to being properly installed against their own dryer being not properly installed, and you could clearly see that there was more buildup of

> lint in the cabinet when it was not properly installed and when it was properly installed there was literally just a trace amount of lint.

Doc. 76-1 (Marzola Dep. 47:5-14). This testing material was among the materials Mr. Marzola relied on in conducting his analysis, forming hypotheses, testing such hypotheses, and developing conclusions. His analysis is sound, is based on sufficient facts and data, and comes after a thorough evaluation of all pertinent materials. Finally, there is no specific physical testing requirement under NFPA 921, FRE 702, or *Daubert* dictating that Mr. Marzola must personally conduct the aforementioned lint testing, or any lint testing, in order to arrive at his opinions. *See e.g., Michigan Millers Mut. Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 2006 WL 897790, *1 - *3 (rejecting defendant's argument—and misplaced reliance on *Chapman v. Maytag Corp.,* 297 F.3d 682 (7th Cir. 2002) involving a novel "resistive short" theory—that plaintiff's expert "never conducted any scientific testing on coffee makers like the one at issue" in the case, including the coffee maker that he alleges caused the fire).

### B. Plaintiffs' Argument That Mr. Marzola Has No Idea How the Dryers Were Installed and Vented Ignores the Fact That in Each of These Cases, Electrolux Had an SEA Examiner at the Scene, Which Mr. Marzola Identified in His Reports.

Electrolux had an investigator at each of the scene examinations—Chris Silman of SEA (Mr. Marzola's employer) attended the Curtis scene examination (Exh. G); Pat Dunn of EFI Global attended the Flones scene examination (Exh. H); and Glenn Deviley, also of EFI Global (now retired) attended the Van Engen scene examination (Exh. I)—all of whom performed thorough examinations and took extensive photographs on which Mr. Marzola relied. Mr. Marzola's reports include significant discussion of the scene examinations, complete with photographs and analyses regarding the homes' layouts, where within the home each Dryer was located and installed, smoke damage, where each Dryer was vented, the type of vent used including whether the duct had a turn(s) and the approximate measurement of each turn(s), and the presence of lint within the ducting

including descriptions of the same. Doc. 76-3 (Curtis Rep. pp. 13-22). According to NFPA 921, which employs the Scientific Method to investigate a fire and determine its cause, facts about the fire incident "are collected by *observation*, experiment, or other direct data-gathering means." (emphasis added) NFPA 921: GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS § 4.3.3 (2021). That Mr. Marzola could not describe the scene examination findings or conversations about the scene examinations by memory, without referring to photographs (*see* the Motion, p. 7) is not surprising or problematic. Plaintiffs' argument that because Mr. Marzola was not present at the scene exams he has no idea how the Dryers were installed and vented is halfhearted and misleading.

### C. Plaintiffs' Commentary on Isolated Deposition Excerpts Does Not Support a Finding that Mr. Marzola's Testimony Should be Excluded.

  i. <u>Plaintiffs' Argument Concerning Back Pressure is Misleading and Unconvincing</u>.

Plaintiffs argue that because Mr. Marzola did not know the measurement of the Dryer's back pressures at the time of the Fires,[3] he couldn't reasonably opine they were excessive. Doc. 75 (the Motion pp. 9-10). In discussing the "back pressure requirement," Plaintiffs include the table from Electrolux's installation instructions that provides maximum turns in and lengths of the dryer vents. Doc. 75 (the "Instructions" p. 5). The Instructions do not include back pressure measurements relating to each acceptable venting configuration. Instead, the Installation Instructions provide multiple acceptable exhaust configurations, and instruct the installer to test the backpressure on the subject dryer "where the exhaust system is not described in the charts . . . to determine if the exhaust system is acceptable." <u>Exh. J</u> (Installation Instructions p. 3). Critically, the Installation Instructions pertain to rigid metal ducts and flexible (or semi-rigid) metal ducts. The problem in this case is that none of the homeowners used metal ducts; all of the homeowners used flexible foil ducts, which

---

[3] In his deposition Mr. Marzola explained why there was not a way to test the Dryers' back pressure after the Fires. See Doc. 75, (the Motion p. 12); Doc 76-1, (Marzola Dep. 141:15-19) ("Well, no, because it wasn't installed, obviously, I'm sure, when they got there. It was already modified. It was already, you know, disassembled, so I don't know that anybody could do any testing.").

Electrolux warns against. *See* Doc. 76-2 (Flones Rep. p. 7), Doc. 76-3 (Curtis Rep. p. 8) and Doc. 76-4 (Van Engen Rep. p. 7); Exh. J (Installation Instructions p. 3).

Taking into account his training, experience and the work he performed in this case, Mr. Marzola can reliably opine that the use of flexible foil ducts, susceptible to excessive turns and bends, and showing signs of crimping or crushing, regularly results in the dryer not being able to effectively exhaust lint, resulting in a buildup of lint inside the venting and dryer cabinet. That he did not (and could not) measure the Dryers' back pressures is immaterial. Mr. Marzola relied on his many years of experience in developing this opinion:

> Well, I mean, accumulated lint - - or excuse me - - lint will be produced throughout the normal dryer cycle. So that is a normal by-product. So lint will accumulate inside a dryer lightly just naturally, you know, being properly installed and all of that. So I'm saying that the increased, you know, lint, the accumulated lint that we saw in this dryer was more than just trace amounts that you would normally expect to see when a dryer is properly installed. […]

Doc. 76-1 (Marzola Dep. 42:7-43:3). Based on his experience, observation of the Dryers, review of Electrolux lint testing ("They tested those dryers, my understanding, properly installed and then disassembled them all; you know, they ran them all with the same type of load, those types of things, and then disassembled and documented, you know, how much lint was inside the cabinet, if you will, and actually measured it, quantitively measured it. And when you looked at the data you could see that all those numbers were very close proximity to each other, whether it was an Electrolux model or Whirlpool or Maytag or whomever the other ones were."),[4] and all of the pertinent materials in this case, Mr. Marzola hypothesized and ultimately reliably opined that had the Dryers been properly installed, the Dryers would have been able to properly exhaust the lint. *See*

---

[4] This testing included Electrolux ball hitch dryers (Doc. 76-1, 45:9-12 (Marzola Dep.)); each of the Dryers in this case were Electrolux ball hitch dryers.

Doc. 76-1 (Marzola Dep. 44:16-45:3). He did not need to know the precise system back pressures to reach this conclusion.

> ii. Plaintiffs' Portrayal of Mr. Marzola's Opinions Concerning the Installation and Location of the Dryer Ducts is Misleading and Unconvincing.

Plaintiffs extract portions of Mr. Marzola's deposition transcript to make it seem (1) that he has no knowledge of how the Dryer ducts were installed; and (2) there's no way to render an opinion about how the Dryers were installed without knowing the exact placement of the vents prior to the Fires. Neither is true.

As previously stated, Mr. Marzola relied on the extensive investigation performed and photographs taken by investigators who attended the scene examinations on behalf of Electrolux. *See* Docs 76-2 (Flones Rep.), 76-3 (Curtis Rep.), and 76-4 (Van Egen Rep.). NFPA 921 specifically states that facts about a fire incident are collected by the investigator by "***observation***, experiment, or other direct data-gathering means." (emphasis added) NFPA 921: GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS § 4.3.3 (2021). That Mr. Marzola himself was not present at these examinations does not prevent him from opining on how the Dryers were installed. Mr. Marzola relied on the scene examination data, his analysis at the laboratory investigations, and his experience, in developing his opinions concerning the installation of the Dryers. For example, in being questioned about the Flones dryer installation at his deposition, Mr. Marzola explained:

> Well, I would say that it's more likely than not that in this case - - ***and I'll specifically point to again the location in the upper part of the wall*** - - that I would believe in this case the way it would be hanging down that you would get a reduction in that - - in that bend, if you will, ***that 90-degree bend by how it was just naturally installed and being kind of pulled downward in a fashion that would reduce the diameter***.[5]

---
[5] Mr. Marzola testified in his deposition that when flexible foil ducts are pulled down the diameter is reduced. (Dep. 24:22-25:4).

Doc. 76-1 (Marzola Dep. 33: 2-11) (emphasis added). In answering questions about the Van Engen dryer in his deposition Mr. Marzola explained:

> And like I pointed out earlier, that 90 degrees seemed to be pointing away from the dryer, so you would basically be pushing that exhaust towards the corner an then it's going to have to, you know, make a turn to come back towards the dryer and then it's got to make another turn to come back out, you know, into the dryer.

*Id*. at 188:15-22. Plaintiffs discount Mr. Marzola's opinions because, due to the destruction caused by the Fires, no one can determine various specific measurements and/or location of component Dryer parts. This, however, does not prevent Mr. Marzola from using the scientific method to develop his opinions in this case. Mr. Marzola had more than sufficient facts and data on which to rely, specifically, extensive findings and photographs from the scene examinations, firsthand knowledge of the laboratory examinations, a host of testing documents and findings, and a wealth of knowledge to draw on. Mr. Marzola reasonably applied engineering principles and his experience to the facts of this case, specifically, the location of the Dryers relative to the venting and exhaust ducts, in arriving at his opinions concerning reduced airflow in this case.

       iii.  <u>Mr. Marzola Opined that the Curtis and Van Engen Dryer Ducts Were Too Long Which Can Result in Additional Bends</u>.

In addition to the other installation facets discussed herein, Mr. Marzola also opined that the Curtis and Van Engen Dryer ducts were too long, and that the excessive venting lengths were not in compliance with Electrolux's Installation Instructions and contain additional bends, which ultimately restricts airflow (and the expulsion of combustible lint) out of the Dryers.[6] *See e.g.*, Doc. 76-3 (Curtis Rep. p. 43). In his report, Mr. Marzola explained that the Curtis Dryer flexible foil duct "used in this installation was excessively longer than necessary, 10'6" length as opposed to approximately 7' length." *Id*. Therefore, the length of the foil venting was longer than needed and

---

[6] Plaintiffs' experts do not dispute that bends in venting can result in reduced airflow. *See e.g.*, <u>Exh</u>. K, 109: 15-20 (Stoddard Dep).

was not in compliance with the duct manufacturer's installation instructions." *Id*. He went on to explain that additional length can "result in additional bends (Figure 6) and collapse the venting that could restrict the air flow of the dryer, as a result of the duct not being properly stretched." *Id*. In his deposition Mr. Marzola described flexible foil ducts that are not trimmed, resulting in bends and other areas where lint can accumulate. Doc. 76-1 (Marzola Dep. 227:4-11). Mr. Marzola also opined that the Van Engen flexible foil duct was longer than necessary—five feet instead of two feet long. Doc. 76-4 (Van Engen Rep. p. 39). This is another facet of installation about which Mr. Marzola rendered opinions concerning the installation of the Dryers that reflect a reliable application of his principles and methods to the facts of this case.

### III. PLAINTIFFS' MOTION DOES NOT ADDRESS RICHARD MARZOLA'S OPINIONS CONCERNING IMPROPER MAINTENANCE OF THE DRYERS AND THEREFORE SUCH OPINIONS CANNOT BE EXCLUDED.

Mr. Marzola's opinions concerning the causes of the Fires rely on his analysis of the (improper) installation and maintenance of the Dryers. While Plaintiffs' Motion extensively discusses Mr. Marzola's opinions concerning installation, it does not specifically address his opinions regarding the homeowners' improper (or complete lack of) maintenance, namely, why Mr. Marzola's opinions that the Dryers were not properly maintained, does not satisfy FRE 702. However, each of Marzola's three reports did, in fact, specifically address (improper) maintenance, and he further explained his opinions concerning improper maintenance at his deposition.

Regarding each of the Fires, Mr. Marzola concluded that the dryer "was not being properly maintained as specified in the Owner's Guide." Doc. 76-3 (Curtis Rep. p. 7) *See also* Doc. 76-2 (Flones Rep. p. 7) and Doc. 76-4, (Van Engen Rep. p. 7). Mr. Marzola more specifically explained:

> 3  Q  Okay. All right. So then going back to your
> 4     opinions, page 6 of Exhibit 3, the third bullet
> 5     point of your conclusions, your second opinion
> 6     is that the accumulated lint inside the Flones
> 7     electric dryer was caused by failure to
> 8     properly maintain the dryer. So let's talk
> 9     about that. What do you mean by "failure to
> 10    properly maintain the dryer"?
> 11 A  Well, as you probably have up or is in that --
> 12    or, actually, it's in a user's guide, I
> 13    believe, or owner's guide, but there is a -- a
> 14    listing there that talks about having an
> 15    18-month cleaning of the cabinet or at least
> 16    every 18 month or something like that, how they
> 17    word that. And so the reason not only
> 18    Electrolux has a warning like that, all dryer
> 19    manufacturers talk about, you know, cleaning
> 20    out the cabinet on a periodic basis or some of
> 21    them actually, you know, have a specific time
> 22    frame of either 12 months or 18 months. You
> 23    know, the reason they do that is kind of what
> 24    we've talked about earlier is to -- is to
> 25    remove that loose lint that has accumulated
>
>                                          Page 57
> 1     through the normal process of drying clothes so
> 2     that way you eliminate or at least greatly
> 3     reduce the chances of, you know, a lint fire.

Doc. 76-1 (Marzola Dep. 56:9 – 57:3). Mr. Marzola further testified at his deposition that the Dryers were not cleaned by an authorized service technician at any time prior to the Fires. *Id*. at 65:4-16, 172:19-21.

While it is unclear whether Plaintiffs are moving to exclude Mr. Marzola's opinions concerning improper maintenance (because Plaintiffs fail to specifically address them in the Motion), there is no reason Mr. Marzola should be prohibited from testifying that the Dryers were improperly maintained. The record is clear that Mr. Marzola opines that one of the causes of the lint buildup in the Dryers, which was the first fuel ignited, was improper maintenance of the Dryers. Because Plaintiffs' Motion does not address these opinions, any argument to exclude them should be considered waived by Plaintiffs.

## IV. MR. MARZOLA CONSIDERED ALTERNATIVE CAUSES INCLUDING MR. STODDARD'S THEORIES.

In the Motion, Plaintiffs refer to Mr. Stoddard's testing and assert that "Marzola never considered any of these alternatives." Doc. 75 (the Motion p. 23). This is not the case; Mr. Marzola considered alternative theories, including Stoddard's, he just reached different conclusions. In the Curtis Report, for example, Mr. Marzola addressed Keefe's and Stoddard's alternative design theories, and explained why he disagreed with them. Mr. Marzola discussed Mr. Keefe's opinion that "[h]ad Electrolux utilized safer alternative materials, it is likely that lint fires would have been limited." Doc. 76-3 (Curtis Rep. p. 48), stating:

> S-E-A does not agree with this opinion. The use of UL HB rated plastic compared to UL 5V rated plastic would have had no bearing on the spread of this fire beyond the dryer. If sufficient lint is present and becomes ignited, the lint will continue to burn and subsequently ignite the plastic components. ***With a flame present, the plastic components will continue to burn regardless of the flammability rating of the plastic (i.e., UL HB or UL 5V). S-E-A has investigated numerous dryer fires that were caused by the ignition of lint that utilized other alternative materials, i.e. metal trap duct and the fire was not contained in the dryer cabinet***. Furthermore, Mr. Curtis was told that Ms. Weatherford was drying clothes when she smelled smoke, opened the door to stop the dryer before she got out of the house. The burn patters on the dryer door revelated that the door was open during the fire, which is consistent with the testimony of Mr. Curtis. With the dryer door being left open, the fire easily escaped the dryer allowing it to spread throughout the basement igniting other combustible materials.

*Id*. at 48-49 (emphasis added). In his deposition, Mr. Marzola was questioned about "the criticisms that Bill Keefe and Mike Stoddard have with regard to the use of HB plastic," and explained why he disagreed with such criticisms. Doc. 76-1 (Marzola Dep. pp. 89-91). While Plaintiffs argue that Mr. Marzola did not consider alternative causes and theories, in reality, he simply disagreed with those proffered by Plaintiffs' experts. A disagreement with an expert's conclusions is not a basis to exclude an expert's opinions under *Daubert*. *See Schultz v. Akzo Novel Paints, LLC,* 721 F.3d 426,

431 (7th Cir. 2013) ("Although this places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must "'focus … solely on principles and methodology, not the conclusions they generate.'") (quoting *Daubert,* 509 U.S. 579, 595 (1983)).

## CONCLUSION

As a Registered Professional Engineer and Certified Fire Investigator, Mr. Marzola is qualified to testify as an expert in this case. Moreover, his specialized knowledge, training and experience will assist the trier of fact to understand the evidence presented in this case. Following the codes, standards, and recommended fire investigation practices set forth in NFPA 921, Mr. Marzola applied the scientific method to develop his opinions, and his opinions reflect a reliable application of principles and methods to the facts of each of the three Fires involved in this case. Plaintiffs' Motion to Exclude Testimony of Richard Marzola should be denied as Mr. Marzola's testimony is admissible under Federal Rule of Evidence 702.

Dated this 12th day of January, 2024.

FOX, O'NEILL & SHANNON, S.C.
Attorneys for Defendant

By: */s/ Electronically signed by Lauren E. Maddente*
_____
LAUREN E. MADDENTE
State Bar No. 1101188
JACOB A. MANIAN
State Bar No. 1064360

P.O. Address:
622 N. Water Street, Suite 500
Milwaukee, WI 53202
Phone: (414) 273-3939
Email: lemaddente@foslaw.com
       jamanian@foslaw.com